JS-6

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

FLORENTINA DEMUTH,

               Plaintiff,

      v.

COUNTY OF LOS ANGELES; LOS ANGELES COUNTY SHERIFF'S DEPARTMENT; WAI CHIU R. LI; and DOES 1-100,

               Defendants.

Case No. CV 10-06783 MWF (CWx)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

    This matter came on for trial before the Court sitting without a jury on May 22, May 23 and May 24, 2012. Following the presentation of evidence and argument, the parties filed supplemental briefs, after which the matter was taken under submission.

    Having carefully reviewed the record and the arguments of counsel, as presented at the hearing and in their written submissions, the Court now makes the following findings of fact and reaches the following conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

**FINDINGS OF FACT**

1.      The events relevant to this case occurred on February 11, 2010, in the Los Padrinos Juvenile Courthouse, of the Superior Court of California for the County of Los Angeles, located in Downey, California.

2.      Plaintiff Florentina Demuth is employed as a Los Angeles County Public Defender and has been at all times relevant to this case.  As of February 2010, she was assigned to Department 250 of the Los Padrinos Juvenile Courthouse.

3.      Defendant Wai Chiu R. Li was employed as a Los Angeles County Sheriff's Department Deputy as of February 2010.  He has since retired from that position.  As of February 2010, he was assigned as the courtroom bailiff for Department 250 of the Los Padrinos Juvenile Courthouse.

4.      As of February 2010, the following persons were employed in the following positions:  Honorable Heidi W. Shirley, Judicial Referee presiding in Department 250; Stephanie Levy, Court Reporter in Department 250; Ron Segalini, Courtroom Clerk in Department 250; Glendy Ortiz, Deputy Public Defender in Department 250; Andrea Mader, Deputy District Attorney in Department 250; Patricia De La Guerra Jones, Public Defender Deputy in Charge for the Los Padrinos Juvenile Courthouse; Alison Hudak, Deputy Public Defender assigned to the Los Padrinos Juvenile Courthouse; Sherri Brown-Williams, Court Liaison for the Los Angeles County Probation Department in Department 250; Walter Munoz, Deputy Public Defender assigned to the Los Padrinos Juvenile Courthouse; Lieutenant Dave Loomis, Los Angeles County Sheriff's Department; Deputy Randy Miranda, Los Angeles County Sheriff's Department assigned to the Los Padrinos Juvenile Courthouse; Kevin Shaw, Senior Legal Office Support Assistant for the Public Defender's Office in the Los Padrinos Juvenile Courthouse; Norma Linares, paralegal in the Public Defender's Office in the Los Padrinos Juvenile Courthouse.

5.      All actions taken by Deputy Li, in connection with the allegations in Ms. Demuth's Complaint (Docket No. 1), on the morning of February 11, 2010, in the Los

Padrinos Juvenile Courthouse, were in the course and scope of his duties as a Los Angeles County Sheriff's Department Deputy.

**A.   February 10, 2010:  Department 250 ("Day 14 of 15" in the Simon Matter)**

6.     Under California Welfare and Institutions Code § 657(a)(1), "[i]n the case of a minor detained in custody at the time of the filing of the petition, the petition must be set for hearing within 15 judicial days from the date of the order of the court directing such detention."  *See also* Cal. Ct. R. 5.774(b) ("If the child is detained, the jurisdiction hearing on the petition must begin within 15 judicial days from the date of the order of the court directing detention.").

7.     On February 10, 2010, a case involving one of Ms. Demuth's juvenile clients (for purposes of this case, identified only as "Simon") was called for adjudication in Department 250.

8.     February 10 was the fourteenth day out of fifteen for adjudication in the Simon matter ("Day 14 of 15").  (Exhibit 1).

9.     On the record in Department 250, Ms. Demuth, Deputy District Attorney for Los Angeles County Emily Baker and Referee Shirley discussed the parties' preparedness for trial and the possibility that the Simon matter would be "sent out" – *i.e.*, transferred to another juvenile court – for adjudication because of Department 250's potential unavailability and the very near "Day 15 of 15" deadline.  (*Id.*)

10.     After a brief recess, Ms. Mader replaced Ms. Baker on the Simon matter, which was continued until the morning of February 11, 2010.  (*Id.*)

**B.   February 11, 2010:  Department 250 ("Day 15 of 15" in the Simon Matter); Ms. Demuth Discussed the Simon Matter with Ms. Mader and Then Left Department 250**

11.     On the morning of February 11, 2010, Ms. Demuth entered Department 250 at approximately 8:40 a.m.  Deputy Li was present in Department 250 at that time and at all times relevant to this case until he left the courtroom approximately one hour later.

12.     Ms. Mader entered Department 250 at around the same time as Ms. Demuth. Ms. Demuth and Ms. Mader then discussed the Simon matter.  It was the last day for adjudication in the Simon matter ("Day 15 of 15"), and Ms. Demuth and Ms. Mader discussed whether the case would be sent out for adjudication.

13.     If the Simon matter could not be heard in Department 250 on February 11, and would be transferred to another courthouse for adjudication, it would have taken some time for Ms. Demuth, Ms. Mader, the juvenile and all other persons involved with the case (including the juvenile's mother) to travel to the "transferee" courthouse.

14.     Ms. Demuth did not believe that the Simon matter should be transferred; Ms. Mader thought it would be necessary.

15.     At some time before 9:00 a.m., Referee Shirley also entered Department 250. Ms. Demuth and Referee Shirley had a brief, informal conversation at that time, but they did not discuss the Simon matter and court was not called to order.  Referee Shirley then exited Department 250.

16.     At the end of her conversation with Ms. Mader at approximately 9:00 a.m., Ms. Demuth left Department 250 and indicated to Ms. Mader that she would not be returning until approximately 1:30 p.m.

**C.     Referee Shirley Took the Bench in Department 250**

17.     Referee Shirley had approximately fifty-three cases on calendar for February 11, which she needed to have completed by 2:00 p.m.  Referee Shirley had an afternoon meeting for juvenile delinquency bench officers.  Department 250 also was engaged in trial in another matter.

18.     When Referee Shirley was ready to call the Simon matter, Ms. Demuth was not in Department 250.

19.     After consulting with a more senior district attorney in Department 250, Ms. Mader asked Deputy Li to page Ms. Demuth using the court's intercom system.

20.     Deputy Li paged Ms. Demuth, but she did not come to Department 250.

-4-

21.     When Ms. Demuth failed to respond and approximately ten minutes after Deputy Li had paged Ms. Demuth, Ms. Mader went to her office to discuss the situation with her supervisor.  The supervisor advised Ms. Mader to have Referee Shirley order Ms. Demuth's appearance in Department 250.

22.     Approximately five minutes later at approximately 9:40 a.m., Ms. Mader returned to Department 250 and discussed the Simon matter with Referee Shirley.  While off-the-record, Ms. Mader asked Referee Shirley to order Ms. Demuth's appearance. (Exhibit 3 at ~0:29).

23.     Referee Shirley asked Deputy Li to page Ms. Demuth; Referee Shirley indicated that she was expecting Ms. Demuth to hear the page because Referee Shirley understood that Ms. Demuth was in the Los Padrinos Juvenile Courthouse.  (*Id.* at ~1:32).

24.     Deputy Li again paged Ms. Demuth, stating as follows:  "Ms. Demuth, Department 250, please.  Ms. Demuth, Department 250."  (*Id.* at ~1:40).

25.     In addition to paging her, Deputy Li also telephoned Ms. Demuth's direct line between one and three times.  There was no answer.

**D.     Referee Shirley Ordered Ms. Demuth to Come to Department 250**

26.     When Ms. Demuth again failed to respond, at approximately 9:45 a.m., Referee Shirley made the following statement from the bench in Department 250: "Alright, I order Ms. Demuth to come to this courtroom.  If she refuses, then Ms. De La Guerra Jones will have to come in and explain to me why this is happening."  (Exhibit 3 at ~4:50).

27.     When Referee Shirley made this statement, Department 250 was not in session.

28.     Referee Shirley's statement was not recorded as an order of Department 250.

29.     There was no bench warrant or body attachment order issued for Ms. Demuth to be moved physically into Department 250.

30.     While Deputy Li was paging and telephoning Ms. Demuth, she was in her personal office inside the Public Defender's office suite, which is inside the Los Padrinos Juvenile Courthouse.

31.     During this time, Ms. Demuth was working on an assignment which Ms. De La Guerra Jones had given to her.  Ms. De La Guerra Jones had instructed Ms. Demuth to prepare Ms. Demuth's other cases for another deputy public defender in the event that the Simon matter were transferred and Ms. Demuth necessarily were to leave the Los Padrinos Juvenile Courthouse.  Ms. De La Guerra Jones had asked Ms. Demuth to complete this assignment as quickly as possible and before Ms. Demuth left the Public Defender's office suite to go to Department 250 because of the possibility that Ms. Demuth would have to leave the Los Padrinos Juvenile Courthouse almost immediately if the Simon matter were to be sent out.

32.     Ms. Demuth heard at least one page for her from Department 250.  She did not respond to Department 250.  She heard her telephone line ringing in her personal office, but she did not answer.

33.     There were secretaries available in the Public Defender's office suite who could have been reached by telephone, but during this time no telephone calls were placed from Department 250 looking for Ms. Demuth to any of those secretaries.

34.     As of February 2010, it was not unusual for attorneys, particular the Deputy Public Defenders, to be absent from Department 250 when their assigned cases were to be called.  In those instances, it was the normal practice of Department 250 for the staff to page and telephone attorneys to come to the courtroom.  Once an attorney was paged, it was not unusual for that attorney to take several minutes or more to come to the courtroom.  Also, the courtroom staff in Department 250 had Ms. Demuth's cellular telephone number.  On other days, she had received cellular telephone calls or text messages from the courtroom staff asking her to come to the courtroom.

35.     Ms. Demuth had been paged and called into Department 250 on other occasions.

36.     On February 11, 2010, she did not receive any cellular telephone or text messages from the courtroom staff in Department 250.

**E.     Deputy Li Left Department 250 to Find Ms. Demuth**

37.     Shortly after Referee Shirley ordered Ms. Demuth to come to Department 250, Deputy Li asked Referee Shirley whether he should leave Department 250 to find Ms. Demuth.

38.     Deputy Li understood Referee Shirley's order to mean that he was to leave Department 250 and bring Ms. Demuth or Ms. De La Guerra Jones back to the courtroom.

39.     Deputy Li believed that it was his duty to do so because other cases were being called and the other members of the courtroom staff could not leave Department 250.

40.     Deputy Li thought that someone needed to leave the courtroom, locate Ms. Demuth, inform her that she was needed in Department 250, and insure that she came back to the courtroom.

41.     However, Deputy Li ordinarily would not leave Department 250 while court was in session because his presence was needed to insure the safety of Referee Shirley and the courtroom staff.

42.     Deputy Li and Referee Shirley briefly discussed these matters, and Referee Shirley agreed that Deputy Li should leave the courtroom to locate Ms. Demuth.

43.     During this conversation, Referee Shirley did not order Deputy Li to bring Ms. Demuth back to Department 250.

44.     Referee Shirley expected that Deputy Li would communicate her order to Ms. Demuth and that Ms. Demuth would come to Department 250.

45.     Shortly after approximately 9:45 a.m., Deputy Li left Department 250 after discussing the matter with Referee Shirley.

46.     Deputy Li felt the situation was urgent given the conversation he had witnessed between Ms. Mader and Referee Shirley relating to the "Day 15 of 15" deadline

in the Simon matter and the fact that he was leaving Department 250 without proper security.

47.     Deputy Li returned to Department 250 with Ms. Demuth only approximately two minutes after leaving.

**F.     Deputy Li Located Ms. Demuth in the Public Defender's Office Suite**

48.     The sequence of events that took place within the Public Defender's office suite, as described below, is based primarily on the testimony of Deputy Li, which the Court found to be the most plausible.  However, the Court did not accept every aspect of Deputy Li's testimony and adopted certain facts from the testimony of Ms. De La Guerra Jones and Ms. Demuth.

49.     In any event, to the extent the relevant testimony among Deputy Li, Ms. De La Guerra Jones and Ms. Demuth differed with respect to the events within the office suite, these differences were not material to the Court's conclusions of law below.   All three witnesses recounted very similar versions of these events.

50.     Deputy Li located Ms. Demuth in the Public Defender's office suite.  From the waiting area, Deputy Li saw Ms. Demuth and Ms. De La Guerra Jones speaking within the office suite.  Deputy Li addressed Ms. Demuth through the security window that divided the waiting area from the office suite.

51.     Deputy Li and Ms. Demuth were well-acquainted and often referred to one another as "Richard" and "Flora."  They may have done so on February 11, 2012.

52.     Deputy Li saw that Ms. De La Guerra Jones was standing next to Ms. Demuth.  Deputy Li was familiar with Ms. De La Guerra Jones and knew that she was Ms. Demuth's supervisor.

53.     Deputy Li understood Referee Shirley's statement to be phrased in the alternative – *i.e.*, Ms. Demuth was to come to Department 250; and, in the event that Ms. Demuth refused to come to Department 250, then Ms. De La Guerra Jones was to go in Ms. Demuth's place.

54.     Deputy Li told Ms. Demuth that she needed to come to Department 250.

-8-

55.    Ms. Demuth said, "I'm not ready," or, "Just a minute," or words to that effect.

56.    Deputy Li responded that Ms. Demuth needed to go to Department 250 "now."

57.    Ms. Demuth gave the same or a similar response.

58.    Several more, similar, back-and-forth statements followed for less than a minute.  At some point, Deputy Li raised his voice, emphasizing that Ms. Demuth was needed in Department 250 "right now."

59.    Ms. Demuth did not understand Deputy Li's agitation.

60.    Deputy Li then left the waiting area.

**G.    Deputy Li Entered the Public Defender's Office Suite and Handcuffed Ms. Demuth**

61.     Deputy Li entered the office suite where he had seen Ms. Demuth and Ms. De La Guerra Jones standing.

62.    (The evidence conflicts as to through which door Deputy Li entered the Public Defender's office suite, but this fact is not material.  However, it is clear that Deputy Li did not have a key or other means of regular access to the office suite.)

63.    When Deputy Li entered the office suite, Ms. Demuth was standing in a different place (outside her personal office) and Ms. De La Guerra Jones was not standing next to her.

64.    Deputy Li walked toward Ms. Demuth and again stated that she needed to go to Department 250.

65.    This time, Ms. Demuth answered, "If you want me to come right now, you'll have to arrest me," or words to that effect.  Ms. Demuth was, by this time, frustrated with Deputy Li's persistence and made this statement sarcastically.

66.    Deputy Li responded, "If I have to," or words to that effect, and approached closer to Ms. Demuth.

67.     Deputy Li understood that Ms. Demuth's statement was conditional, and that if she were to come to Department 250 immediately, then Deputy Li would have to bring her to the courtroom.

68.     Deputy Li concluded that Ms. Demuth would not voluntarily respond to Referee Shirley's order unless he fulfilled her express condition, and that the only way he could carry out Referee Shirley's instruction that Ms. Demuth appear in Department 250 was to handcuff and escort her back to the courtroom.

69.     Ms. Demuth asked, "Are you going to handcuff me?"

70.     Deputy Li removed his handcuffs from his belt and handcuffed Ms. Demuth with her arms behind her back.

71.     Ms. Demuth was confused.  She did not understand why she was being handcuffed and thought that she may have been under arrest for some other reason.

72.     Ms. Demuth complied and did not resist Deputy Li or fight against him or attempt to evade him as he was handcuffing her.

73.     Deputy Li handcuffed Ms. Demuth based on Referee Shirley's order that Ms. Demuth come to Department 250.  Deputy Li also considered the apparent urgency of the "Day 15 of 15" deadline in the Simon matter and the safety concerns inherent in his absence from Department 250.

74.     Ms. Demuth did not pose a danger to herself, to Deputy Li, or to anyone else. Deputy Li did not believe that Ms. Demuth posed any such danger.

75.     When Deputy Li placed Ms. Demuth in handcuffs, he knew there was no warrant issued for Ms. Demuth to be moved physically into Department 250.  Deputy Li did not believe Ms. Demuth was committing any crime at that time, and he did not believe there was probable cause to arrest her.  Deputy Li did not believe there was a basis for him to conduct an investigative stop of Ms. Demuth and he was not conducting an investigative stop of her.

76.     Ms. Demuth was not refusing to attend court as a subterfuge to frustrate the adjudication of the Simon matter on "Day 15 of 15." It was her intention to return to the courtroom after dealing with the issues arising from her absence that afternoon.

77.     At no point did Deputy Li state to Ms. Demuth that Referee Shirley had ordered Ms. Demuth to come to Department 250.

**H.     Deputy Li Escorted Ms. Demuth to Department 250**

78.     After the handcuffs were placed on Ms. Demuth, Deputy Li put his hand on Ms. Demuth's upper arm and escorted her toward Department 250. Ms. Demuth did not resist him at any time. Ms. Demuth was furious.

79.     Deputy Li led Ms. Demuth out from the Public Defender's office suite into a public hallway which led to Department 250.

80.     Ms. De La Guerra Jones followed them.

81.     There were several dozen people in that hallway.

82.     Department 250 was located approximately twenty feet down the hall from the Public Defender's office suite.

83.     The walk to Department 250 took less than one minute.

**I.     Deputy Li and Ms. Demuth Reentered Department 250**

84.     Despite another proceeding being underway when Ms. Demuth and Deputy Li walked into Department 250, Ms. Demuth exclaimed, "Hi, everybody!" (Exhibit 3 at ~7:39).

85.     Referee Shirley was surprised to see Ms. Demuth in handcuffs escorted by Deputy Li into Department 250.

86.     Deputy Li escorted Ms. Demuth to a location at the back of Department 250, in front of the bailiff's desk. Then, within seconds of entering Department 250, Deputy Li asked Ms. Demuth whether he should remove the handcuffs. Ms. Demuth responded that he should leave the handcuffs on. (*Id.* at ~7:49).

87.     Deputy Li then escorted Ms. Demuth to another location in Department 250, closer to the bench and counsels' tables, where Deputy Li and Ms. Demuth stood waiting

1   for several minutes until the Simon matter was called.  During that period, Deputy Li
2   again asked Ms. Demuth whether he should remove the handcuffs.  Ms. Demuth
3   responded that he should leave the handcuffs on and asked Deputy Li why he was asking
4   her about removing the handcuffs.  Deputy Li did not respond.

5          **J.**    **The Simon Matter Was Called**

6         88.    The Simon matter was called at approximately 9:50 a.m., and Department
7   250 went on-the-record at that time.  (Exhibit 3 at ~10:37; Exhibit 2).  The proceedings,
8   however, related to Ms. Demuth rather than the Simon matter adjudication.  Ms. Demuth
9   remained in handcuffs for approximately another eight minutes.

10        89.    Ms. De La Guerra Jones asked Referee Shirley why Ms. Demuth had been
11  placed in handcuffs.  (Exhibit 2 at 3 of 13).

12        90.    Referee Shirley responded:  "The reason that was done was because Ms.
13  Demuth refused to answer our pages or respond to our polite requests to have her appear
14  in court.  The problem is, as you all know, this is last day for this case.  It's set for
15  adjudication.  We discussed this yesterday.  And there was a general agreement that this
16  case was going to be sent out, and we are going to send it out since this is the last day."
17  (*Id.* at 3-4 of 13).

18        91.    Referee Shirley stated further, "There was no order to arrest her.  There was
19  an order that she appear in this Court.  And it's clear to me – I know that Deputy Li would
20  never resort to such a procedure unless he absolutely had to.  And he is a gentleman of
21  impeccable behavior and principles.  And so we regret – I regret that this happened, but
22  we have to send this case out."  (*Id.* at 4 of 13).

23        92.    Ms. Mader added:  "This doesn't appear to be an arrest.  It appears that what
24  was going on is that [Deputy Li was] effectuating this Court's order," to which Referee
25  Shirley replied, "Right."  (*Id.* at 6-7 of 13).

26        93.    With respect to Ms. Demuth, Referee Shirley instructed:  "You are expected
27  to get your file, as you said you needed to, and return to this courtroom. . . . You are not
28  under arrest."  (*Id.* at 9 of 13).

94.     Department 250 took a brief recess.

95.     After the on-the-record hearing, Deputy Li removed the handcuffs from Ms. Demuth with permission from Referee Shirley.  (Exhibit 3 at ~18:42).  In total, Ms. Demuth remained in handcuffs for approximately eleven minutes.

96.     Shortly after Deputy Li removed the handcuffs from Ms. Demuth, she returned to the Public Defender's office suite to retrieve her file for the Simon matter.

97.     Ms. Demuth returned to Department 250, and the Simon matter again was called and transferred for adjudication.

## CONCLUSIONS OF LAW

It is important to recognize at the outset that Ms. Demuth's lawsuit revolves around two related, alleged violations of 42 U.S.C. § 1983:  one for an unreasonable seizure, and the second for excessive force, both in violation of the Fourth Amendment to the United States Constitution.  Defendants argue that Deputy Li is shielded from § 1983 liability by the doctrines of (1) quasi-judicial immunity, and/or (2) qualified immunity.

## I. QUASI-JUDICIAL IMMUNITY

A lengthy quotation from *Arnold v. County of El Dorado*, Civ. No. S-10-3119 KJM GGH PS, 2011 WL 902204 (E.D. Cal. Mar. 15, 2011), provides helpful background on the legal doctrine of quasi-judicial immunity:

> Because the doctrine of quasi-judicial immunity is derived from judicial immunity, a short discussion of judicial immunity is instructive. Judges are absolutely immune from civil liability for damages for acts performed in their judicial capacity.  An act is "judicial" when it is a function normally performed by a judge and the parties dealt with the judge in his judicial capacity.  A judge loses his or her immunity when acting in clear absence of jurisdiction, but one must distinguish acts that are performed in excess of a judge's authority (remains absolutely immune) from those acts taken in clear absence of jurisdiction.  Thus, in a case where a judge actually ordered the detainment of an individual by means of excessive force, an act clearly outside of his legal authority, he remained immune because the order was taken in his capacity as a judge and not with the clear absence of jurisdiction. . . .

-13-

[Defendants], as officers of the court, enjoy quasi-judicial immunity insofar as they perform pursuant to a judge's orders.  Judicial and quasi-judicial immunity extends to nonjurists "'who perform functions closely associated with the judicial process.'"  It is particularly important to extend such immunity to the judge's subordinates who have acted pursuant to a judge's explicit direction because otherwise these subordinates would become a "lightning rod for harassing litigation aimed at judicial orders."

*Id.* at \*3 (citations omitted).

As the Ninth Circuit has stated:  "The rationale for immunizing persons who execute court orders is apparent.  Such persons are themselves 'integral parts of the judicial process.'  The fearless and unhesitating execution of court orders is essential if the court's authority and ability to function are to remain uncompromised."  *Coverdell v. Dept. of Social and Health Servs.*, 834 F.2d 758, 765 (9th Cir. 1987) (citation omitted) ("[Plaintiff] has neither alleged nor shown that in executing the order, [defendant] exceeded its scope or acted improperly in any other way. . . . [defendant]'s act, however, was plainly authorized by the court's order.").

The Seventh Circuit also has provided a helpful discussion:

Our quasi-judicial immunity cases demonstrate that the primary function to be protected is judicial or quasi-judicial decision making.  This is true of cases challenging discretionary conduct by a quasi-judicial body like a parole board, and it is also true when the lawsuit is aimed at persons integral to the judicial process but whose conduct is not "functionally comparable" to a judge's.  For example, we have recognized absolute immunity for law enforcement officials when the challenged conduct (the mere act of enforcing a foreclosure judgment) was specifically ordered by the judge.  The source of the plaintiff's wrong in [a prior case] was the judge's order itself, and we reasoned that a suit against the officers was not the appropriate vehicle for challenging the validity of that order.  Under those circumstances, extension of absolute immunity is not primarily to protect the enforcement function performed by the deputies, but rather to protect the judicial decision-making function by discouraging collateral attacks and encouraging appeals.  It further avoids the "untenable result" of requiring "sheriffs and other court officers who enforce properly entered judgments pursuant to facially valid court orders to act as appellate courts,

-14-

reviewing the validity of both the enforcement orders and the underlying judgments before proceeding to collect on them."

> *Similarly, for court personnel and adjuncts who do not exercise a discretionary function comparable to a judge's, the justification for extending absolute immunity is most compelling when the lawsuit challenges conduct specifically directed by the judge*, and not simply the manner in which the judge's directive was carried out.  By contrast, the Supreme Court has held that a court reporter was not entitled to absolute immunity for her own misconduct (losing her trial notes and failing to provide a transcript of the trial), reasoning that "court reporters do not exercise the kind of judgment that is protected by the doctrine of judicial immunity."

> The policies articulated in our quasi-judicial immunity cases have less force when . . . the challenged conduct is the manner in which the judge's order is carried out, *and not conduct specifically directed by a judge*. Reading [the plaintiff]'s complaint in the light most favorable to her, the claim is not that the judge ordered the deputies to use unreasonable force, but that the deputies exceeded the judge's order by the manner in which they executed it.  The claim for damages in this case is not therefore a collateral attack on the judge's order (an order that [the plaintiff] concedes was valid), and an appeal of the judge's order would provide no remedy.  Similarly, the deputies are not being called upon to answer for wrongdoing directed by the judge, but instead for their own conduct.  And that conduct – the manner in which they enforced the judge's order – implicates an executive, not judicial, function.

*Richman v. Sheahan*, 270 F.3d 430, 436-38 (7th Cir. 2001) (citations omitted) (emphasis added).

All of the above authority holds (or at least assumes) that quasi-judicial immunity applies only to conduct that comes within the scope of the applicable court order.  *See, e.g.*, *Verdi v. Kirby*, Civil Action No. 5:06-cv-408 (HL), 2009 WL 112713, at *3 n.4 (M.D. Ga. Jan. 16, 2009) ("The scope of quasi-judicial immunity extends to a defendant's conduct that is prescribed in a court order, but does not extend to conduct which goes beyond that ordered by a court order.").

*Evans v. McKay*, 869 F.2d 1341 (9th Cir. 1989), is instructive.  In *Evans*, the Blackfeet Indian Reservation Tribal Court issued an order directing the police to seize tax-

-15-

free cigarettes and certain tire repair equipment from the plaintiffs.  The police attempted to take possession of the items, but the plaintiffs resisted and refused to give them up.  The police arrested the plaintiffs for interfering with the performance of police duties.  *Id.* at 1343-44.

The defendant officers argued that they "executed a facially valid court order and that they, therefore, [were] entitled to quasi-judicial immunity." *Id.* at 1348 n.8 (citing *Coverdell*, 834 F.2d at 764-65).  The Ninth Circuit found that quasi-judicial immunity did not apply because the Tribal Court had not ordered the police to arrest the plaintiffs: "Clearly, the city police did not rely on the Tribal Court order to arrest the appellants.  *The order simply mandated the seizure of cigarettes and tire repair equipment.  The Tribal Court order, moreover, did not 'plainly authorize' the arrests of the appellants*.  Rather, the arrests were based on a City of Browning ordinance prohibiting the obstruction of justice." *Id.* at 1348 n.8 (quoting *Coverdell*, 834 F.2d at 765) (emphasis added).

Significantly, however, the Ninth Circuit did recognize the possibility that **qualified immunity** may have applied on these facts.  *Id.* ("The police officers also argue that they are entitled to a qualified immunity from liability . . . . , the issue of qualified immunity was not raised or decided below.  We decline to reach it for the first time on appeal."); *see also Haugen v. Fields*, No. CV-05-3109-RHW, 2007 WL 765264, at *1 (E.D. Wash. Mar. 9, 2007) (stating on motion for reconsideration that, "[e]ven if the Court erred in holding that [the defendant] is entitled to absolute immunity for her role in executing the court order, this does not end the inquiry . . . because [the defendant] may be entitled to qualified immunity").

Here, Defendants have cited no authority, nor do they even argue, that quasi-judicial immunity would apply to any conduct that Referee Shirley did not order but that Deputy Li reasonably believed she had ordered.  The justification and policy relating to quasi-judicial immunity would seem to weigh against any such extension.  (Defendants argue instead that Deputy Li's conduct, in fact, was ordered by Referee Shirley.)

The Court holds that Deputy Li exceeded the scope of Referee Shirley's order based on his mistaken understanding of that order. These facts seem analogous to an officer who exceeds the scope of a court order by the "manner" in which he enforces the order (*e.g.*, by excessive force). Generally, courts have not applied quasi-judicial immunity in such cases. As the Court (the Honorable Jacqueline H. Nguyen) held in this case on Defendants' Motion for Summary Judgment, or in the Alternative, for Partial Summary Judgment (Docket No. 22): "This Court agrees with the Tenth and Seventh Circuits that if Deputy Li's actions exceeded the scope of the judicial order, then quasi-judicial immunity should not apply." (Docket No. 39 at 7). Indeed, even in the countervailing Eighth Circuit case that applied quasi-judicial immunity to a bailiff's use of excessive force, there was no question that the judge specifically had ordered the bailiff to remove the person from the courtroom. *See Martin v. Hendren*, 127 F.3d 720, 721-22 (8th Cir. 1997).

The Court concludes that quasi-judicial immunity does not here apply for the simple reason that Referee Shirley did not order Deputy Li to bring Ms. Demuth to the courtroom. Deputy Li exceeded the scope of Referee Shirley's order and as a result quasi-judicial immunity cannot shield him from liability.

## II.  QUALIFIED IMMUNITY

When the defense of qualified immunity is raised, there are two threshold questions a court must answer. First, was there a violation of a constitutional right? Second, was that right clearly established? *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).

### A.  Ms. Demuth's Constitutional Right to Be Free from Unauthorized Seizures Was Violated

Under the Fourth Amendment to the U.S. Constitution, applicable to the States through the Fourteenth Amendment, a state officer cannot involuntarily "seize" an individual without proper legal authority – *e.g.*, a warrant (or probable cause) to arrest, reasonable suspicion for a *Terry* investigative stop, etc. *See, e.g., Dunaway v. New York*, 442 U.S. 200, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979). Under the first prong of the

1    *Saucier* test, if Referee Shirley did not order Deputy Li to bring Ms. Demuth to the

2    courtroom, then Deputy Li violated Ms. Demuth's Constitutional right to be free from an

3    unauthorized seizure.  As Defendants admit, there was no other, even potential, legal

4    authority for the seizure.

5         Briefly, the Court notes that it seems misguided to characterize this case as one of

6    "excessive force."  Ms. Demuth's argument really is that any application of force was

7    excessive because the seizure was unauthorized, as discussed above.  Indeed, at the

8    conclusion of closing arguments, counsel for Ms. Demuth conceded that, *if Deputy Li had*

9    *the proper legal authority to bring Ms. Demuth to the courtroom*, Deputy Li did not use

10   any excessive force in doing so.

11        Nevertheless, to the extent Ms. Demuth's § 1983 claim challenges the actual force

12   Deputy Li applied to Ms. Demuth instead of (or in addition to) the lack of authority for

13   him to do so, the analysis likewise would go to the first *Saucier* prong – *i.e.*, whether a

14   Constitutional right had been violated.  *Scott v. Harris*, 550 U.S. 372, 381, 127 S. Ct.

15   1769, 167 L. Ed. 2d 686 (2007) ("[A] Fourth Amendment seizure [occurs] . . . when there

16   is a governmental termination of freedom of movement through means intentionally

17   applied. . . . a claim of excessive force in the course of making [a] . . . seizure of [the]

18   person . . . [is] properly analyzed under the Fourth Amendment's objective reasonableness

19   standard.  The question we need to answer is whether [the defendant]'s actions were

20   objectively reasonable." (citations and internal quotation marks omitted)).

21        The Court concludes that the use of force and the quantum of force that Deputy Li

22   applied to Ms. Demuth were reasonable given the circumstances, and that there was no

23   Constitutional violation for use of excessive or unreasonable force.

24        However, the Court does conclude that Deputy Li had no legal authority to seize

25   Ms. Demuth because, as discussed above, Referee Shirley did not order him to do so.  As

26   a result, Ms. Demuth's Fourth Amendment right to be free from unauthorized seizures

27   under the Constitution was violated.

28

**B.     This Right Was Not Clearly Established Under the Circumstances of the Case**

Consequently, under the second *Saucier* prong, the question is whether Ms. Demuth's right to be free from unauthorized seizures was clearly established "'in light of the specific context of the case.'"  *Scott*, 550 U.S. at 377 (quoting *Saucier*, 533 U.S. at 201).  "Under *Saucier*'s qualified immunity inquiry, the second question requires the court to ask whether a reasonable officer could have believed that his conduct was lawful."  *Dixon v. Wallowa County*, 336 F.3d 1013, 1019 (9th Cir. 2003).

The case law abounds with examples of officers who have violated the Fourth Amendment in acting without the proper legal authority (*e.g.*, warrant, court order, probable cause, etc.), but who nevertheless were shielded from liability by qualified immunity because they acted based on a reasonable belief that there was such authority.  Here are some examples:

In *Gregory v. Thompson*, 500 F.2d 59 (9th Cir. 1974), the Ninth Circuit held that judicial immunity did not apply where the "judge left his desk in the courtroom [to remove the plaintiff from the courtroom].  It appears that he forced [the plaintiff] out the door, threw him to the floor in the process, jumped on him, and began to beat him."  *Id.* at 61.  But the Ninth Circuit noted, "Judge Thompson should be able to claim a qualified immunity which would insulate him from civil liability if he acted in good faith even while using excessive force."  *Id.* at 65; *see also id.* at 65 n.6 ("While we have said that those acting 'at the direction of a judge . . . to whom they were immediately and directly responsible' would enjoy quasi-judicial immunity, that immunity attaches only insofar as the authorization to act extends.  Moreover, any authorization to use excessive force could shield neither a judge nor bailiff, we suppose, since that authorization would be clearly outside the jurisdiction of the judge." (citation omitted)).

In *Hansen v. Cannon*, 122 F. App'x 265 (7th Cir. 2004), the court ordered eviction from land belonging to the plaintiffs ("Lot 9") but not from an adjacent lot ("Lot 8").  *Id.* at 266.  The Seventh Circuit stated that the defendant "would still enjoy qualified

immunity if he 'could have reasonably believed' that the seizures from Lot 8 were constitutional despite the exclusion of that lot from the eviction order.  The question is not whether he should have believed that his actions were reasonable, but whether he *could* have, because qualified immunity protects all but patently incompetent officials and those who wilfully break the law.  [The defendant] would therefore prevail unless there is evidence that he knew Lot 8 was separate from Lot 9, or if suspicious circumstances would have caused any reasonable officer to question his or her actions."  *Id.* at 271 (citations omitted) (emphasis in original); *see Kyrtsos v. Cash-Calhoun*, No. 10-cv-12295, 2011 WL 740437, at *1, 5 (E.D. Mich. Feb. 24, 2011), *rev'd in part on reconsideration on other grounds*, 2011 WL 893200 (E.D. Mich. Mar. 14, 2011) (stating, where plaintiffs alleged that defendants had violated their Constitutional rights in entering plaintiffs' home and seizing their minor children, that "[i]f Defendant Officers reasonably believed they were acting pursuant to a court order at the time of the search and seizure, they are entitled to qualified immunity").

Similarly, in *Napier v. Jonas*, No. 1:94-CV-630, 1995 WL 454774 (W.D. Mich. Feb. 10, 1995), the plaintiff alleged that the defendant officers had used excessive force in removing him from the courtroom – the officers had "pushed and shoved him."  *Id.* at *1. "While quasi-judicial immunity protects court officers from the fact of their enforcement of a court order, it does not empower them to execute the court order with excessive force. The act of physically removing someone from the courtroom is not an act of a judicial nature. . . . Accordingly, to the extent Plaintiff is challenging the manner in which Defendants removed him from the Court, those actions would not be protected by quasi-judicial immunity.  *Courtroom bailiffs and deputies called to enforce court orders are, however, entitled to qualified immunity*.  Government officials performing discretionary functions have qualified immunity shielding them from civil liability if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Id.* at *4 (citation omitted) (emphasis added).

1   With respect to unlawful arrests, *Brass v. County of Los Angeles*, 10 F. App'x 412

2   (9th Cir. 2001), is likewise illustrative. *See id.* at 414 (citation omitted) ("Government

3   officials are entitled to qualified immunity from suits under § 1983 so long as their actions

4   did 'not violate clearly established statutory or constitutional rights of which a reasonable

5   person would have known.'").  In a case of mistaken identity, the Ninth Circuit noted the

6   "parties agree that Brass [the plaintiff] and Nichols [for whom the officer had an arrest

7   warrant] were of the same race and coloring, were within three years of the same age, and

8   were within one inch in height and twenty pounds in weight.  These undisputed

9   similarities between Brass and Nichols strongly weigh in favor of a finding of probable

10  cause to arrest Brass. . . . the undisputed physical similarities between Brass and Nichols

11  combined with the identical residential address were sufficient to establish that a

12  reasonable officer in [the defendant]'s shoes would have thought he had probable cause to

13  arrest Brass on the warrant for Nichols.  Thus, [the defendant] has qualified immunity and

14  is not liable for the arrest under 42 U.S.C. § 1983." *Id.* at 414-15.

15  In *Delgado v. City of Los Angeles*, 57 F.3d 1076, 1995 WL 341515 (9th Cir. 1995)

16  (unpublished), the plaintiff alleged that his rights were violated when he mistakenly was

17  arrested following a tip from a confidential informant.  *Id.* at *1.  The Ninth Circuit found

18  that the plaintiff "was arrested pursuant to an arrest warrant that was valid on its face.  In

19  addition, [the plaintiff] raised no genuine issue of fact that the arresting officers acted

20  either with malice or without the reasonable belief that [the plaintiff] was the individual

21  named on the arrest warrant," and noted that "any individual defendants named would

22  have been entitled to qualified immunity."  *Id.* at *1-2.

23  Further, in *Molieri v. County of Marin*, No. C-10-05430 MMC, 2012 WL 1309172

24  (N.D. Cal. Apr. 16, 2012), the court denied the plaintiff's motion for summary judgment

25  where it was "undisputed that no warrant to arrest [the plaintiff] existed . . . , [but] there

26  [was] a triable issue as to whether [the defendant] reasonably but mistakenly believed a

27  warrant existed."  *Id.* at *2.

28

-21-

1    Several other decisions from courts outside of the Ninth Circuit confirm this
2    principle.  *See Hargroves v. City of New York*, 411 F. App'x 378, 385 (2d Cir. 2011)
3    (stating that, "[f]or purposes of qualified immunity analysis, we need only consider
4    whether it was 'objectively reasonable' for the officers to believe, in the circumstances
5    presented, that they had the legal authority to detain the plaintiffs"); *Rogers v. Powell*, 120
6    F.3d 446, 455 (3d Cir. 1997) ("[A]n officer will be entitled to qualified immunity from
7    liability in a civil rights suit for unlawful arrest provided it was objectively reasonable for
8    him to believe . . . that probable cause for the arrest existed."); *Edwards v. Baer*, 863 F.2d
9    606, 608 (8th Cir. 1988) ("Based upon an objective appraisal of the facts we find that a
10   reasonable and competent police officer could have believed that a warrant existed and
11   that he had legal authority to make an arrest based on that warrant.").
12           Finally, cases analyzing qualified immunity in the context of improper detentions
13   further support this reasoning.  *See, e.g.*, *Douthit v. Jones*, 619 F.2d 527, 535-36 (5th Cir.
14   1980) ("We hold that to be entitled to qualified immunity from liability for false
15   imprisonment under § 1983, [the defendants] must present evidence of objective facts
16   upon which they could have based a good faith, reasonable belief that they had the legal
17   authority to continue to hold [the plaintiff] once he had satisfied the sentence imposed
18   upon him . . . . The mere statement that they believed in good faith that their actions were
19   lawful will not suffice to establish the defense; they must present objective evidence
20   showing the reasonableness of that belief to warrant submission of the issue of their good
21   faith to the jury.").  For example, *Buccini v. Florida Department of Children and Family
22   Services*, No. 2:08-cv-698-FtM-29DNF, 2009 WL 5127990 (M.D. Fla. Dec. 18, 2009),
23   was a case in which there was no court order requiring the plaintiff to give up custody of
24   her grandchild, but "both officers could reasonably [have] believe[d] that [the plaintiff]
25   was in violation of a condition of placement imposed by the court.  [The defendant] was
26   not required to credit plaintiff's assertion of no court order over the information he
27   received from a fellow officer that a court order existed.  Receiving inconsistent
28

1 information does not preclude finding probable cause.  Therefore, both Defendants are

2 entitled to qualified immunity as to the detention." *Id.* at *5 (citation omitted).

3          The Court has not found, and the parties have not cited, a case directly on point

4 with the facts of this case.  Nevertheless, the Court concludes that Deputy Li brought Ms.

5 Demuth to Department 250 under the reasonable belief (albeit mistaken) that Referee

6 Shirley had ordered him to do so.  Courts have applied qualified immunity to protect

7 officers in analogous situations.

8          Referee Shirley had ordered Ms. Demuth to come to Department 250.  Deputy Li

9 believed that it was his duty to effectuate this order, and he discussed the matter with

10 Referee Shirley before he left Department 250 to do so.  He recognized the urgency of the

11 "Day 15 of 15" Simon matter and of his leaving the courtroom without the proper

12 security.

13          Ms. Demuth delayed when Deputy Li informed her that she was needed in

14 Department 250, and she already had failed to respond to Deputy Li's pages and telephone

15 calls.  Deputy Li believed that Ms. Demuth made her immediate appearance in

16 Department 250 conditional on his "arresting her," and he consequently handcuffed her

17 and escorted to Department 250 – all under the belief that he was carrying out Referee

18 Shirley's order.  Deputy Li could have interpreted Ms. Demuth's obstinance as refusal and

19 thereupon acted on Referee Shirley's alternative order (*i.e.*, that Ms. De La Guerra Jones

20 appear in Department 250 to explain), but the Court declines to hold that it was

21 unreasonable for Deputy Li not to have done so.

22          The Court further notes that Referee Shirley, in essence, endorsed the

23 reasonableness of Deputy Li's belief when she commented on the situation after Deputy

24 Li and Ms. Demuth entered the courtroom.

25          The Court holds that Deputy Li's belief that he had the legal authority to bring Ms.

26 Demuth to the courtroom and his conduct in doing so were objectively reasonable under

27 the circumstances, and that Deputy Li therefore is entitled to qualified immunity for his

28 actions in this case.

III.   **STATE LAW CLAIMS**

For the same reasons, Deputy Li is not liable on Ms. Demuth's state law claims for false imprisonment, battery, negligence and intentional infliction of emotional distress. Deputy Li's conduct was reasonable under the circumstances.  *See, e.g.*, *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1165-66 (N.D. Cal. 2009) (holding that defendant officers were not liable for false imprisonment because reasonable but mistaken belief that plaintiff had committed battery constituted lawful privilege for brief detention); *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272-73, 74 Cal. Rptr. 2d 614 (1998) (holding that under California law a "Plaintiff must prove unreasonable force as an element of the tort" of battery); *Castro v. City of Hanford*, 546 F. Supp. 2d 822, 829 (E.D. Cal. 2008) (granting summary judgment in favor of defendants on claims for negligence and false imprisonment based on officers' reasonable belief that plaintiff was person named in warrant and that arrest was lawful); *Mejia v. City of San Bernardino*, No. EDCV 11-00452 VAP (DTBx), 2012 WL 1079341, at *13 (C.D. Cal. Mar. 30, 2012) (granting motion for summary judgment on intentional infliction of emotional distress claim and holding that defendant officer's "actions were reasonable as a matter of law.  Accordingly, Plaintiffs cannot establish Defendants engaged in 'extreme and outrageous conduct'").

Consequently, Defendant County of Los Angeles (also sued and served herein as "Los Angeles County Sheriff's Department") likewise cannot be found vicariously liable under the doctrine of respondeat superior pursuant to California Government Code § 815.2(a)

**VERDICT**

**In favor of Defendants and against Plaintiff.**  The Court will enter a separate judgment pursuant to Federal Rule of Civil Procedure 54 and 58(b).

Dated:  August 10, 2012

_____
MICHAEL W. FITZGERALD
United States District Court Judge